NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JOHN J. KUCERA (Cal. Bar No. 274184)
Assistant United States Attorney
Asset Forfeiture Section
       1400 United States Courthouse
       312 North Spring Street
       Los Angeles, California 90012
       Telephone: (213) 894-3391
       Facsimile: (213) 894-7177
       E-mail:  John.Kucera@ oj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | No. CV 18-8423 |
|---|---|
| Plaintiff, | **VERIFIED COMPLAINT FOR FORFEITURE** |
| v. | 18 U.S.C. §§ 981(a)(1)(A) & (C) |
| $404,374.12 IN BANK FUNDS SEIZED FROM NATIONAL BANK OF ARIZONA ACCOUNT '0178; $1,925.80 IN BANK FUNDS SEIZED FROM NATIONAL BANK OF ARIZONA ACCOUNT '0151; $613,573.28 IN BANK FUNDS SEIZED FROM NATIONAL BANK OF ARIZONA ACCOUNT '3645; $260,283.40 IN BANK FUNDS SEIZED FROM NATIONAL BANK OF ARIZONA ACCOUNT '6910; $64,552.82 IN BANK FUNDS SEIZED FROM OR FROZEN IN ASCENSUS BROKER SERVICES '4301; AND $56,902.00 IN BANK FUNDS SEIZED FROM OR FROZEN IN ASCENSUS BROKER SERVICES '8001, | [U.S.P.I.S.] |
| Defendants. | |

The United States of America brings this complaint against the above-captioned asset(s) and alleges as follows:

## PERSONS AND ENTITIES

1.   The plaintiff is the United States of America ("plaintiff" or the "government").

2.   The defendants are $404,374.12 in Bank Funds Seized from National Bank of Arizona Account '0178; $1,925.80 in Bank Funds Seized from National Bank of Arizona Account '0151; $613,573.28 in Bank Funds Seized from National Bank of Arizona Account '3645; $260,283.40 in Bank Funds Seized from National Bank of Arizona Account '6910; $64,552.82 in Bank Funds Seized from or Frozen in Ascensus Broker Services '4301; and $56,902.00 in Bank Funds Seized from or Frozen in Ascensus Broker Services '8001, (hereinafter, the "DEFENDANT ASSETS"), more particularly described in Attachment A.

3.   The DEFENDANT ASSETS are held in the names of James Larkin, Margaret Larkin, Ocotillo Family trust, Troy C. Larkin, and/or Ramon Larkin.  The persons and entities whose interests may be affected by this action are James Larkin, Margaret Larkin, Ocotillo Family trust, Troy C. Larkin, and Ramon Larkin.

4.   Contemporaneously with the filing of this complaint, plaintiff is filing related actions seeking the civil forfeiture of the following assets (collectively, the "SUBJECT ASSETS"):

**ACCOUNT HELD IN THE NAME OF POSTING SOLUTIONS, LLC:**

a.   $3,374,918.61 seized from Prosperity Bank account '7188 ("Prosperity '7188 Funds" or "Account 1") held in the name of Posting Solutions, LLC.

**ACCOUNTS HELD IN THE NAME OF CEREUS PROPERTIES LLC:**

b.   $5,462,027.17 seized from Compass Bank account '3873

("Compass '3873 Funds" or "Account 2"), held in the name of Cereus Properties, LLC

    c.   $407,686.14 seized from Compass Bank account '4862 ("Compass '4862 Funds" or "Account 3"), held in the name of Cereus Properties, LLC.

**ASSETS ACQUIRED BY MICHAEL LACEY ("Lacey"):**

    d.   $689,884.48 seized from First Federal Savings & Loan of San Rafael account '3620 ("FFS&L of SR '3620 Funds" or "Account 4") held in the name of Michael Lacey ("Lacey");

    e.   $515,899.85 seized from Republic Bank of Arizona account '2485 ("RBA '2485 Funds" or "Account 5"), held in the name of Lacey;

    f.   $75,835.31 seized from Republic Bank of Arizona account '1897 ("RBA '1897 Funds" or Account 6), held in the name of Lacey;

    g.   $500,000.00 seized from Republic Bank of Arizona account '3126 ("RBA '3126 Funds" or "Account 7"), held in the name of Lacey;

    h.   $600,000.00 seized from or frozen in Republic Bank of Arizona Certificate of Deposit ("CDARS")[1] account '8316 ("RBA '8316 Funds" or "Account 8"), held in the name of Lacey;

    i.   $302,177.57 seized from or frozen in Republic Bank of Arizona CDARS account '8324 ("RBA '8324 Funds" or "Account 9"), held in the name of Lacey;

    j.   $300,000.00 seized from or frozen in Republic Bank of Arizona CDARS account '8332 ("RBA '8332 Funds" or "Account 10"), held in the name of Lacey;

    k.   $734,603.70 seized from or frozen in Credit Union account

---

[1] CDARS is a program that allows a depositor to spread funds across several banks in order to maintain account balances below the Federal Deposit Insurance Corporation's insurance limits at any given bank.

4

'2523 ("SFFCU '2523 Funds" or "Account 11"), held in the name of Lacey;

l.    $2,412,785.47 seized from or frozen in Money Gram originating from Midfirst Bank account '4139 ("IOLTA '4139" or Account 12), held in the name of attorney, "J.B." for the benefit of Lacey;

m.    All right and title to the real property located in Sebastopol, California titled in the name of Finca Manzana for Sebastopol, LLC ("Sebastopol Property"), APN 076-100-0008-000, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

n.    All right and title to the real property located in San Francisco, California titled in the name of Lacey and Alyson Talley ("San Francisco Property 1"), APN 07-1008-057-01, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;[2]

o.    All right and title to the real property located in San Francisco, California titled in the name of  Casa Bahia for San Francisco, LLC ("San Francisco Property 2"), APN 0563-029, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

p.    All right and title to the real property located in San Francisco, California titled in the name of Lacey ("San Francisco Property 3"), APN 0097C011, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

---

[2] Pursuant to Local Rule 5.2-1, only the city and state of residence addresses are set forth in this Complaint

q.   All right and title to the real property located in Sedona, Arizona titled in the name of Creek Hideaway, LLC ("Sedona Property"), APN 405-06-001B, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

r.   All right and title to the real property located in Paradise Valley, Arizona titled in the name of Lacey ("Paradise Valley Property 1"), APN 173-11-006C, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

s.   All right and title to the real property located in Paradise Valley, Arizona titled in the name of Lacey ("Paradise Valley Property 2"), APN 164-05-122, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

**ASSETS ACQUIRED BY JAMES LARKIN ("Larkin"):**

t.   $1,546,076.35 seized from Republic Bank of Arizona account '1889 ("RBA '1889 Funds" or "Account 13"), held in the name of James Larkin;

u.   $1,001,731.18 seized from Republic Bank of Arizona account '2592 ("RBA '2592 Funds" or "Account 14"), held in the name of Larkin;

v.   $206,156.00 seized from Republic Bank of Arizona account '1938 ("RBA '1938 Funds" or "Account 15"), held in the name of Larkin;

w.   $501,248.14 seized from Republic Bank of Arizona account '8103 ("RBA '8103 Funds" or "Account 16"), held in the name of Larkin;

x.   $251,436 seized from Republic Bank of Arizona account '8162 ("RBA '8162 Funds" or "Account 17"), held in the name of Larkin;

y.   Any and all funds to be seized from Republic Bank of Arizona account '8189 ("RBA '8189 Funds" or "Account 18"), held in the name of Larkin.  RBA is holding the account until it matures, at which time RBA will issue a check to the government for Account 18 funds;

z.   $621,832.06 in U.S. currency seized from Perkins Coie Trust Company account '0012 ("PCTC '0012 Funds" or "Account 19"), held in the name of Margaret Larkin ("M. Larkin");

aa.  $9,882,828.72 in investments seized from Perkins Coie Trust Company account '0012 ("PCTC Investment Funds" or "Account 20"), held in the name of M. Larkin;

bb.  $34,149,280.00 seized and maintained from Acacia Conservation Fund LP account '2020 ("ACF Funds" or "Account 21"), held in the name of Ocotillo Family Trust;

cc.  $278.73 seized from Bank of America account '8225 ("BA '8225 Funds" or "Account 22"), held in the name of Larkin's son, Troy C. Larkin ("T. Larkin");

dd.  $1,038.42 seized from Bank of America account '7054 ("BA '7054 Funds" or "Account 23"), held in the name Larkin's son, Ramon Larkin ("R. Larkin");

ee.  All right and title to the real property located in Saint Helena, California titled in the name of Larkin and M. Larkin, Trustees for Ocotillo Family Trust ("Saint Helena Property"), APN 030-050-028-000, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

7

ff.   All right and title to the real property located in Chicago, Illinois titled in the name of  John C. Larkin ("J.C. Larkin"), M. Larkin and Larkin ("Chicago Property"), APN 20-14-201-079-1054, including all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom;

**ASSETS ACQUIRED BY JOHN BRUNST ("Brunst"):**

gg.   $359,527.06 seized from Compass Bank account number '3825 ("Compass '3825 Funds" or "Account 24"), held in the name of the John Brunst Family Trust;

hh.   $5,848,729.00 seized from Alliance Bernstein account '6878 ("AB '6878 Funds" or "Account 25"), held in the name of the Brunst Family Trust;

ii.   $372,878.00 seized from Alliance Bernstein account '4954 ("AB '4954 Funds" or "Account 26"), held in the name of the Brunst Family Trust;

jj.   $342,596.00 seized from Alliance Bernstein account '7982 ("AB '7892 Funds" or "Account 27"), held in the name of the Brunst Family Trust;

kk.   $306,277.00 seized from Alliance Bernstein account '7889 ("AB '7889 Funds" or "Account 28"), held in the name of the Brunst Family Trust;

ll.   $275,328.00 seized from Alliance Bernstein account '7888 ("AB '7888 Funds" or "Account 29"), held in the name of the Brunst Family Trust;

mm.   $527,624.00 seized from Alliance Bernstein account '6485 ("AB '6485 Funds" or "Account 30"), held in the name of the Brunst Family Trust;

**ASSETS ACQUIRED BY SCOTT SPEAR ("Spear"):**

nn.  $404,374.12 seized from National Bank of Arizona account '0178 ("NBA '0178 Funds" or "Account 31"), held in the name of Scott Spear;

oo.  $1,925.80 seized from National Bank of Arizona account '0151 ("NBA '0151 Funds" or "Account 32"), held in the name of Spear and Ellona Spear ("E. Spear"); and

pp.  $613,573.28 seized from National Bank of Arizona account '3645 ("NBA '3645 Funds" or "Account 33"), held in the name of Spear and E. Spear Family Trust.

qq.  $260,283.40 seized from National Bank of Arizona account '6910 ("NBA '6910 Funds" or "Account 34"), held in the name of Spear and E. Spear Family Trust.

rr.  $64,552.82 seized from or frozen in Ascensus Broker Services '4301 ("ABS '4301 Funds" or "Account 35"), held in the name of Spear's adult daughter, Natasha Spear ("N. Spear").

ss.  $56,902.99 seized from or frozen in Ascensus Broker Services '8001 ("ABS '8001 Funds" or "Account 36"), held in the name of N. Spear.

**ACCOUNT HELD IN THE NAME OF PRIMUS TRUST**

tt.  $16,500,000 seized from K&H account '1210 ("K&H '1210 Funds" or "Account 37"), held in the name of the Primus Trust.  The bank is located in Hungary.

**ACCOUNTS HELD IN THE NAME OF GOLD LEAF SRO:**

uu.  €1,680,028.85 seized from Fio account '2226 ("Fio '2226 Funds" or "Account 38"), held in the name of the Gold Leaf SRO.  The bank is located in the Czech Republic;

vv.  £60.98 seized from Fio account '2231 ("Fio '2231 Funds"

"Account 39"), held in the name of the Gold Leaf SRO. The bank is located in the Czech Republic;

ww. $72.87 seized from Fio account '2230 ("Fio '2230 Funds" "Account 40"), held in the name of the Gold Leaf SRO. The bank is located in the Czech Republic;

**ACCOUNTS HELD IN THE NAME OF PROTECCTIO SRO:**

xx. €3,213,937.82 seized from Fio account '4194 ("Fio '4194 Funds" or "Account 41"), held in the name of the Protecctio SRO. The bank is located in the Czech Republic;

yy. $52.90 seized from Fio account '4196 ("Fio '4196 Funds" or "Account 42"), held in the name of the Protecctio SRO. The bank is located in the Czech Republic;

zz. £52.65 seized from Fio account '4198 ("Fio '4198 Funds" or "Account 43"), held in the name of the Protecctio SRO. The bank is located in the Czech Republic;

**ACCOUNTS HELD IN THE NAME OF VARICOK COMPANY SRO:**

aaa. €605,976.95 seized from Fio account '8083 ("Fio '8083 Funds" "Account 44"), held in the name of the Varicok Company SRO. The bank is located in the Czech Republic;

bbb. £458.99 seized from Fio account '8086 ("Fio '8086 Funds" "Account 45"), held in the name of the Varicok Company SRO. The bank is located in the Czech Republic;

ccc. $48.10 seized from Fio account '8080 ("Fio '8080 Funds" "Account 46"), held in the name of the Varicok Company SRO. The bank is located in the Czech Republic.

**ACCOUNTS HELD IN THE NAME OF AD TECH BV:**

ddd. Any and all funds seized from Bank Frick account 'K000 K ("BF 'K000 K Funds" "Account 47") on or about June 1, 2018, held in

1  the name of the Ad Tech BV.  The bank is located in the Principality

2  of Liechtenstein;

3       eee. Any and all funds seized from Bank Frick account 'K000 U

4  ("BF 'K000 U Funds" "Account 48") on or about June 1, 2018, held in

5  the name of the Ad Tech BV.  The bank is located in the Principality

6  of Liechtenstein;

7       fff. Any and all funds seized from Bank Frick account 'K000 E

8  ("BF 'K000 E Funds" "Account 49") on or about June 1, 2018, held in

9  the name of the Ad Tech BV.  The bank is located in the Principality

10  of Liechtenstein;

11       ggg. Any and all funds seized from Bank Frick account 'K001 K

12  ("BF 'K001 K Funds" "Account 50") on or about June 1, 2018, held in

13  the name of the Ad Tech BV.  The bank is located in the Principality

14  of Liechtenstein.

15       **ACCOUNTS IN THE NAME OF PROCOP SERVICES BV:**

16       hhh. Any and all funds seized from Knab Bank account '7664 ("KB

17  '7664 Funds" "Account 51") on or about May 24, 2018, held in the name

18  of the Procop Services BV.  The bank is located in the Kingdom of the

19  Netherlands.

20       **ACCOUNTS HELD IN THE NAME OF GULIETTA GROUP BV:**

21       iii. Any and all funds seized from Rabo Bank account '2452 ("RB

22  '2452 Funds" "Account 52") on or about May 24, 2018, held in the name

23  of the Gulietta Group BV.  The bank is located in the Kingdom of the

24  Netherlands.

25       **ACCOUNTS HELD IN THE NAME OF UNIVERSADS BV:**

26       jjj. Any and all funds seized from Rabo Bank account '4721 ("RB

27  '4721 Funds" "Account 53") on or about May 24, 2018, held in the name

28  of the UniversAds BV.  The bank is located in the Kingdom of the

11

Netherlands.

**ACCOUNTS HELD IN THE NAME OF OLIST OU:**

kkk. Any and all funds seized from LHV Pank account number '4431 ("LHVP '4431 Funds" "Account 54") on or about June 15, 2018, held in the name of Olist Ou ("Ou").  The bank is located in the Republic of Estonia.

**ACCOUNTS HELD IN THE NAME OF CASHFLOWS EUROPE LIMITED:**

lll. £747,664.15 seized from Saxo Payments account '1262 ("SP '1262 Funds" "Account 55"), held in the name of the Cashflows Europe Limited ("Cashflows").  Cashflows is holding these funds for the benefit of Gulietta Group B.V., Universads B.V, Procop Services B.V., and Proteccio SRO, each of which company is a Backpage owned or controlled entity.  United Kingdom law enforcement officials have restrained the funds held by these four companies and consolidated them into this Saxo Payments account. The bank is located in the United Kingdom.

**ASCIO/WMB INC DOMAIN NAMES:**

mmm. atlantabackpage.com; backpage.be; backpage.com; backpage.com.br; backpage.cz; backpage.dk; backpage.ee; backpage.es; backpage.fi; backpage.fr; backpage.gr; backpage.hu; backpage.ie; backpage.it; backpage.lt; backpage.mx; backpage.net; backpage.no; backpage.pl; backpage.pt; backpage.ro; backpage.si; backpage.sk; backpage.us; backpage-insider.com; bestofbackpage.com; bestofbigcity.com; bigcity.com; chicagobackpage.com; denverbackpage.com; newyorkbackpage.com; phoenixbackpage.com;sandiegobackpage.com;seattlebackpage.com; and tampabackpage.com. ("Seized Domain Names"), and all rights and privileges associated therewith.

**BACKPAGE SURRENDERED DOMAIN NAMES:**

nnn. admoderation.com; admoderators.com; adnet.ws;
adplace24.com; adplaces24.com; adpost24.com; adpost24.cz;
adquick365.com; adreputation.com; ads-posted-mp.com; adsplace24.com;
adspot24.com; adspots24.com; adsspot24.com; adtechbv.co.nl;
adtechbv.com; adtechbv.nl; advert-ep.com; adverts-mp.com; axme.com;
back0age.com; backpa.ge; backpaee.com; backpage-insider.com;
backpage.adult; backpage.ae; backpage.at; backpage.ax; backpage.be;
backpage.bg; backpage.bg; backpage.ca; backpage.cl; backpage.cn;
backpage.cn; backpage.co.id; backpage.co.nl; backpage.co.nl;
backpage.co.nz; backpage.co.uk; backpage.co.ve; backpage.co.za;
backpage.com; backpage.com.ar; backpage.com.au; backpage.com.ph;
backpage.cz; backpage.dk; backpage.ec; backpage.ee; backpage.ee;
backpage.es; backpage.fi; backpage.fi; backpage.fr; backpage.fr;
backpage.gr; backpage.gr; backpage.hk; backpage.hk; backpage.hu;
backpage.hu; backpage.ie; backpage.in; backpage.it; backpage.jp;
backpage.kr; backpage.lt; backpage.lv; backpage.lv; backpage.me;
backpage.mx; backpage.my; backpage.net; backpage.nl; backpage.no;
backpage.no; backpage.nz; backpage.pe; backpage.ph; backpage.pk;
backpage.pl; backpage.porn; backpage.pt; backpage.ro; backpage.ro;
backpage.se; backpage.sex; backpage.sg; backpage.si; backpage.si;
backpage.sk; backpage.sk; backpage.sucks; backpage.tw; backpage.uk;
backpage.uk.com; backpage.us; backpage.vn; backpage.xxx;
backpage.xyz; backpagecompimp.com; backpagecompimps.com;
backpagepimp.com; backpagepimps.com; backpagg.com; backpagm.com;
backpagu.com; backpaoe.com; backpawe.com; backqage.com; backrage.com;
backxage.com; bakkpage.com; bcklistings.com; bestofbackpage.com;
bestofbigcity.com; bickpage.com; bigcity.com; bpclassified.com;

13

1  bpclassifieds.com; carlferrer.com; clasificadosymas.com;

2  clasificadosymas.net; clasificadosymas.org;

3  classifiedsolutions.co.uk; classifiedsolutions.net;

4  classyadultads.com; columbusbackpage.com; connecticutbackpage.com;

5  cracker.co.id; cracker.com; cracker.com.au; cracker.id;

6  cracker.net.au; crackers.com.au; crackers.net.au; ctbackpage.com;

7  dallasbackpage.com; denverbackpage.com; easypost123.com;

8  easyposts123.com; emais.com.pt; evilempire.com; ezpost123.com;

9  fackpage.com; fastadboard.com; guliettagroup.nl; htpp.org;

10  ichold.com; internetspeechfoundation.com;

11  internetspeechfoundation.org; loads2drive.com; loadstodrive.com;

12  loadtodrive.com; losangelesbackpage.com; mediafilecloud.com;

13  miamibackpage.com; minneapolisbackpage.com; mobileposting.com;

14  mobilepostings.com; mobilepostlist.com; mobilposting.com; naked.city;

15  nakedcity.com; newyorkbackpage.com; paidbyhour.com; petseekr.com;

16  petsfindr.com; phoenixbackpage.com; posteasy123.com; postfaster.com;

17  postfastly.com; postfastr.com; postonlinewith.com; postonlinewith.me;

18  postseasy123.com; postsol.com; postszone24.com; postzone24.com;

19  postzones24.com; rentseekr.com; results911.com; sandiegobackpage.com;

20  sanfranciscobackpage.com; seattlebackpage.com; sellyostuffonline.com;

21  sfbackpage.com; simplepost24.com; simpleposts24.com; svc.ws;

22  truckrjobs.com; ugctechgroup.com; universads.nl;

23  villagevoicepimps.com; websitetechnologies.co.uk;

24  websitetechnologies.com; websitetechnologies.net;

25  websitetechnologies.nl; websitetechnologies.org; weprocessmoney.com;

26  wst.ws; xn--yms-fla.com; ymas.ar.com; ymas.br.com; ymas.br.com;

27  ymas.bz; ymas.bz; ymas.cl; ymas.cl; ymas.co.bz; ymas.co.bz;

28  ymas.co.cr; ymas.co.cr; ymas.co.ni; ymas.co.ni; ymas.co.ve;

ymas.co.ve; ymas.com; ymas.com.br; ymas.com.br; ymas.com.bz;
ymas.com.bz; ymas.com.co; ymas.com.co; ymas.com.do; ymas.com.do;
ymas.com.ec; ymas.com.ec; ymas.com.es; ymas.com.es; ymas.com.gt;
ymas.com.gt; ymas.com.hn; ymas.com.hn; ymas.com.mx; ymas.com.ni;
ymas.com.ni; ymas.com.pe; ymas.com.pe; ymas.com.pr; ymas.com.pr;
ymas.com.pt; ymas.com.uy; ymas.com.uy; ymas.com.ve; ymas.com.ve;
ymas.cr; ymas.cr; ymas.do; ymas.do; ymas.ec; ymas.ec; ymas.es;
ymas.es; ymas.org; ymas.pe; ymas.pe; ymas.pt; ymas.us; ymas.us;
ymas.uy; ymas.uy; and ymas.uy.com. ("Surrendered Domain Names"), and
all rights and privileges associated therewith.

### BACKPAGE SURRENDERED ASSETS:

ooo. $699,940.00 surrendered on or about April 6, 2018, from ING Bank account '7684, ("ING '7684 Funds"), held in the name of Payment Solutions BV.

ppp. $106,988.41.00 surrendered on or about April 6, 2018, from ING Bank account '2071 ("ING '2071 Funds"), held in the name of Payment Solutions BV.

qqq. $499,910.01 surrendered on or about April 6, 2018, from US Bank account '0239 ("US Bank '2039 Funds"), held in the name of Affordable Bail Bonds LLC.

rrr. $50,000.00 surrendered on or about April 6, 2018, from Enterprise Bank and Trust account '7177 ("EBT '7177 Funds"), held in the name of Global Trading Solutions LLC.

sss. $1,876.36 surrendered on or about August 23, 2018, from ING Bank account '2071 ("ING '2071 Funds"), held in the name of Payment Solutions BV.

ttt. $50,357.35 surrendered on or about August 24, 2018, from ING Bank account '7684 ("ING '7684 Funds"), held in the name of

1   Payment Solutions BV.

2       uuu. $248,970.00 surrendered on or about May 11, 2018, from

3   Citibank NA, account '0457 ("Citibank NA '0457 Funds"), held in the

4   name of Paul Hastings LLP.

5       vvv. $52,500.00 surrendered on or about June 25, 2018, from

6   Enterprise Bank and Trust account '7177 ("EBT '7177 Funds"), held in

7   the name of Global Trading Solutions LLC.

8       www. $65,000.00 surrendered on or about July 18, 2018, from

9   Enterprise Bank and Trust account '7177 ("EBT '7177 Funds"), held in

10  the name of Global Trading Solutions LLC.

11      xxx. $5,534.54 surrendered on or about August 9, 2018, from

12  Enterprise Bank and Trust account '7177 ("EBT '7177 Funds"), held in

13  the name of Global Trading Solutions LLC.

14      yyy. $40,000.00 surrendered on or about July 16, 2018, from

15  Crypto Capital

16      zzz. 6 Bitcoins surrendered on or about April 6, 2018, from a

17  Backpage controlled wallet;

18      aaaa.    199.99995716 Bitcoins surrendered on or about April 6,

19  2018, from a Backpage controlled wallet;

20      bbbb.    404.99984122 Bitcoins surrendered on or about April 6,

21  2018, from a Backpage controlled wallet;

22      cccc.    173.97319 Bitcoins surrendered on or about April 26,

23  2018, from a Backpage controlled wallet;

24      dddd.    411.00019 Bitcoins surrendered on or about April 13,

25  2018, from a Backpage controlled wallet;

26      eeee.    2.00069333 Bitcoins surrendered on or about May 7,

27  2018, from a Backpage controlled wallet;

28      ffff.    136.6544695 Bitcoins surrendered on or about June 15,

16

2018, from a Backpage controlled wallet;

    gggg.    2,673.59306905 Bitcoin Cash surrendered on or about April 26, 2018, from a Backpage controlled wallet;

    hhhh.    55.5 Bitcoin Cash surrendered on or about May 3, 2018, from a Backpage controlled wallet;

    iiii.    73.62522241 Bitcoin Cash surrendered on or about June 15, 2018, from a Backpage controlled wallet;

    jjjj.    16,310.79413202 Litecoins surrendered on or about April 26, 2018, from a Backpage controlled wallet;

    kkkk.    783.9735116 Litecoins surrendered on or about June 15, 2018, from a Backpage controlled wallet;

    llll.    509.81904619 Bitcoin Gold surrendered on or about June 21, 2018, from a Backpage controlled wallet; and

    mmmm.    $3,713,121.03 wire surrendered on or about August 13, 2018, from Bank of America account `3414, held in the name of Davis Wright Tremaine, LLP.

## **NATURE OF THE ACTION**

    5.    This is a civil action *in rem* to forfeit assets involved in and traceable to proceeds derived from a conspiracy to launder money, internationally launder money for promotion of one or more specified unlawful activities ("SUA"), and/or financial transactions involving illicit proceeds.  The property sought for forfeiture is located in the United States and abroad, including the Country of Hungary, the Czech Republic, the Principality of Liechtenstein, and the Kingdom of the Netherlands.  Forfeiture is sought pursuant to (1) 18 U.S.C. § 981(a)(1)(C), on the ground that the SUBJECT ASSETS were derived from violations of SUA; and (2) 18 U.S.C. § 981(a)(1)(A), on the ground that the SUBJECT ASSETS were involved in one or more

transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 and/or 1957.

## JURISDICTION AND VENUE

6.   This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1).

7.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355.

8.   Venue lies in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) or 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the Central District of California and/or 28 U.S.C. § 1395(b), because certain of the SUBJECT ASSETS are located in the Central District of California.

## INDIVIDUALS AND ENTITIES

9.   Backpage.com, LLC, ("Backpage") incorporated in Delaware in 2004, was an internet-based company that allowed customers to post on-line classified advertisements.  These advertisements were posted in a variety of categories, including adult, automotive, community, dating, jobs, local places, musicians, rentals and services.  Prior to its closure by federal law enforcement authorities in April 2018, Backpage was visited by 75 to 100 million unique internet visitors per month.

10.   Between 2004 and April 2018, Backpage realized annual profits of tens of millions of dollars from adult advertisement. Historically, the adult category, where Backpage advertisers posted sex trafficking ads, make up less than ten percent of all the website's advertisements.  However, those ads generated more than 90 percent of Backpage's revenue.

11.   Michael LACEY ("Lacey") was a co-creator of Backpage.com

18

who was responsible for the website's policies and strategic direction.  Lacey maintained significant control over the website during the relevant period described in this complaint, and continued to receive tens of millions of dollars in Backpage-related distributions even after purportedly selling his interest in Backpage in 2015.

12.  James Larkin ("Larkin") was a co-creator of Backpage.com who was responsible for the website's policies and strategic direction.  Larkin maintained significant control over the website during the relevant period described in this complaint, and continued to receive tens of millions of dollars in Backpage-related distributions even after purportedly selling his interest in Backpage in 2015.

13.  Carl Ferrer ("Ferrer"), though not an original owner, was a co-creator and one of the original officers of Backpage, having initially served as Backpage's vice-president, and later as CEO. Ferrer is also the CEO of several Backpage-related entities in the Netherlands, including "Website Technologies," "Amstel River Holdings," and "Ad Tech BV."

14.  John "Jed" BRUNST ("Brunst") was a minority owner of Backpage who owned 5.67 percent of the company at the time of its inception.  Brunst served as the Chief Financial Officer of Backpage and several of Backpage's parent companies.

15.  Scott Spear ("Spear") was a minority owner of Backpage who owned 4.09 percent of the company at the time of its inception. Spear served as Executive Vice President of one of Backpage's parent companies.

16.  "M.G." had no formal position at Backpage, but was the

1    President, Chief Executive Officer, Treasurer, and Secretary of the

2    Backpage-controlled entity called "Posting Solutions," a wholly owned

3    subsidiary of Backpage that received payments from Backpage

4    advertisers.  M.G. was also the Chief Financial Officer of Website

5    Technologies, and directed and controlled many of the international

6    and domestic financial transactions of Backpage and its related

7    entities.

8        17.  Daniel HYER ("Hyer") served as Backpage's Sales and

9    Marketing Director.  He remained an account signatory for numerous

10    Backpage-controlled entities, including Website Technologies, until

11    Backpage's closure.

12        18.  Andrew PADILLA ("Padilla") served as Backpage's Operations

13    Manager.

14        19.  Joye Vaught ("Vaught") served as Backpage's assistant

15    Operations Manager.

16        20.  Lacey, Larkin, Ferrer, Brunst, Spear, M.G., Hyer, Padilla,

17    and Vaught are referred to collectively herein as "Backpage

18    Operators".

19                   **EVIDENCE SUPPORTING FORFEITURE**

20    **I.  THE FORMATION AND EVOLUTION OF BACKPAGE**

21        21.  Lacey and Larkin were the founders of the *Phoenix New*

22    *Times*, an alternative newspaper based in Arizona.  Lacey and Larkin

23    subsequently acquired several other alternative newspapers that they

24    operated through an entity called Village Voice Media Holdings

25    ("VVMH").  Spear served as VVMH's Executive Vice President and Brunst

26    served as VVMH's Chief Financial Officer.

27        22.  VVMH publications routinely featured illegal prostitution

28    ads as far back as the 1980's.

23.   By 2000, the popularity of the website www.craigslist.com ("Craigslist"), which offered free classified ads, and included prostitution ads began to disrupt VVMH's business, which depended on classified advertising revenue.

24.   Lacey and Larkin, assisted by Ferrer, sought to address this disruption by creating Backpage, which would compete directly with Craigslist.  As stated in an internal Backpage document, "in 2004, in response to the Craigslist threat that was decimating daily newspapers, VVMH launched its own online classified site, Backpage.com, named after the back page of VVMH's print publication."

25.   From 2004 until 2015, Lacey and Larkin bore primary responsibility for Backpage's policies and strategic direction.  In 2015, Lacey and Larkin purported to sell all or substantially all of their respective interests in Backpage to Ferrer.  In fact, Lacey and Larkin retained significant control over Backpage, and both continued to receive millions of dollars of annual distributions of Backpage revenue.

26.   Most of Backpage's earnings represented proceeds of illegal activity, specifically prostitution and sex trafficking, including child sex trafficking.  By 2015, the major credit card companies were refusing to process payments to or for Backpage, and banks closing Backpage's accounts out of concern the accounts were being used for illegal purposes.

27.   In response to these measures, the Backpage Operators initiated and pursued a wide variety of money laundering strategies. These strategies included (a) instructing customers to send checks and money orders to a Post Office box, funneling those funds into bank accounts held in the names of entities with no apparent

connection to Backpage, and then giving customers a corresponding "credit" to purchase Backpage ads; (b) wiring Backpage proceeds to foreign bank accounts and then redistributing the funds to Backpage Operators as compensation, or moving the funds to domestic bank accounts (to conceal the nature, source, location, ownership and control of those funds and promote Backpage's ongoing illegal operations); and (c) converting customers payments and the proceeds of Backpage's illegal business into and out of cryptocurrency.

**II.  THE SOURCES AND MANIPULATION OF CRIMINAL PROCEEDS**

28.  The SUBJECT ASSETS, including the DEFENDANT ASSETS, represent property derived from or traceable to proceeds to multiple knowing violations of federal laws constituting specified unlawful activity, including 18 U.S.C. §§ 1952 and 1591.  The SUBJECT ASSETS were also involved in multiple knowing violations of 18 U.S.C. §§ 1956 and 1957.

29.  The SUBJECT ASSETS are located both inside and outside the United States.  Domestic bank accounts owned or controlled by Backpage received wire transfers from places outside of the United States, which funds were actually or intended to be used to promote sex trafficking SUA, in violation of 18 U.S.C. § 1956(a)(2)(A) (International Money Laundering).  Additionally, some of the Subject Accounts received transfers or deposits in excess of $10,000 traceable to the SUA, in violation of 18 U.S.C. § 1957 (Money Laundering Spending Statute).

30.  Backpage, which operated principally online, controlled numerous internet domain names that were seized by the government March 2018[3], and are defendants in these related actions.  The

---

[3] CR. Misc. 2:18-MJ-00711

Domains were registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar.  Domain registrars serve to ensure that a registered domain name is not licensed to more than one user.  Domain registration allows the owner of the domain to direct internet traffic to a specific webserver.  The Defendant Domains were acquired and maintained with funds traceable to the criminal scheme described herein, specifically with funds from Account 1, and were the mechanism Backpage used to promote prostitution and sex trafficking activity.

### A.   PAYMENTS FOR ADVERTISING ON BACKPAGE

31.   In order to post ads on Backpage, an advertiser was required to buy Backpage "credits," which could be accomplished in several ways, including:

a.   mailing gift cards, checks, or money orders to "Posting Solutions" at a P.O. Box in Dallas, Texas;

b.   using a credit card to buy credits through a third-party credit card payment processor;

c.   paying with digital currency (specifically, Backpage accepted Bitcoin, Bitcoin Cash, Litecoin, and Ethereum).  If the advertiser selected this option, Backpage provided a digital currency wallet address where the advertiser could send the electronic transfer of the digital currency; and

d.   paying with currency through a third party payment processor.  Once the third-party payment processor received the currency, it would convert it to digital currency and then electronically transfer that digital currency to a Backpage digital currency wallet.

32.   Digital Currency was processed through the subject accounts

23

1   in the following way:

2       a.   When Backpage received digital currency, it would aggregate

3   the digital currency and then transfer it to a third-party exchanger

4   like GoCoin;

5       b.   In exchange for the digital currency, the exchanger would

6   transfer U.S. dollars from its foreign bank account(s) into Backpage

7   operating accounts.  The exchanger could then sell its Bitcoin on

8   various Bitcoin markets.

9       33.  Plaintiff contends that five to ten percent of the ads

10  posted on Backpage.com were placed within the Central District of

11  California (including Los Angeles and Orange Counties).  Between

12  January 10 and February 3, 2016, approximately 500,000 ads were

13  posted on Backpage.com and paid for with Bitcoin, for which Backpage

14  received over $3,840,000 in revenue.  Of these approximately 500,000

15  ads, approximately 28,400 were posted only in

16  LosAngeles.Backpage.com, Ventura.Backpage.com,

17  SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and

18  SanGabrielValley.Backpage.com.  These specific ads generated

19  approximately $184,479 in revenue.

20      **B.   BACKPAGE PROMOTION OF PROSTITUTION AND SEX TRAFFICKING**

21      34.  Numerous Backpage ads were used to sell minors for sex and

22  forcibly traffic adult women for sex.  Among the pimps and sex

23  traffickers who used Backpage to advertise their victims were many

24  who were later convicted of sex trafficking offenses.  For example,

25  from these reviews, the following analysis was made:

26      a.   During 2014 and 2015, a pimp sold S.F., a minor girl, for

27  sex.  The pimp advertised S.F. on Backpage's "Escort" section in the

28  Los Angeles area of California and in Arizona.  The ad contained

24

phrases such as "New In Town" and "Sexy Dark Asain Bombshell with a Nice & Tight {Booty}."  The ad selling S.F. on Backpage included multiple pictures showing her legs, stomach, shoulders and buttocks. The pimp who placed the ad was ultimately arrested, and convicted on state sex trafficking charges, and sentenced to 196 years imprisonment.

b.   During 2014 and 2015, the same pimp sold A.C., a minor girl, for sex.  In November 2014, at the age of 17, A.C. was first sold for sex through a Backpage ad using phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire." The Backpage ad selling A.C. included pictures of her showing her legs, stomach, shoulder, and buttocks, and posed her in sexually provocative positions.

c.   Between November 2015 and December 2015, a pimp drove two women and four minor girls (T.S., S.L., K.O., and R.W.) from Columbus, Ohio to a hotel in St. Charles, Missouri.  The next day, the pimp told the girls to post ads on Backpage.com.  Some of the girls took calls and engaged in paid sex acts with Backpage customers who responded to the ads.  The ads the girls posted included pictures of them on a bed showing their buttocks.  Another image featured a naked girl's body pressed against a mirror.  Other pictures appeared more mundane, such as images of girls posing clothed in front of a mirror.  However, these ads used phrases like "I'm sweet as a treat maybe even sweeter" and "not a lot need to be said. my pic are 100% real."  In 2017, this pimp was convicted of Federal sex trafficking charges and sentenced to 300 months in prison.

d.   In or around 2010, in Washington, J.S., a minor girl, was sold for sex through the use of Backpage ads.  J.S.'s pimp drafted

the ads, which contained words and phrases such as,
"W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL."
The ads included pictures of J.S. in provocative positions showing
her breasts and buttocks.  On March 29, 2011, the pimp who sold J.S.
for sex was sentenced to over 26 years imprisonment on State/Federal
charges related to sex trafficking.

e.    Between 2011 and 2016, a female victim, D.O., who was
between the ages of 14 and 19 during those years, was sold for sex
through Backpage ads.  D.O.'s female pimp instructed D.O. that
Backpage was the safest place to advertise because Backpage did not
require age verification.  D.O.'s Backpage ads included words and
phrases that were indicative of prostitution, such as "roses" (money)
and "back door" (anal sex).  Some of the customers who responded to
D.O.'s Backpage ads forced D.O. to perform sexual acts at gunpoint,
choked her to the point of having seizures, and gang-raped her.

35.   Plaintiff alleges that all levels of Backpage management
were aware of Backpage's role in promoting criminal activity.  For
example:

a.    On September 21, 2010, a group of state attorneys general
("AG") wrote a letter to Backpage observing that "ads for
prostitution-including ads trafficking children-are rampant on the
site," and arguing that "[b]ecause Backpage cannot, or will not,
adequately screen these ads, it should stop accepting them
altogether."  The state AGs acknowledged that this step would cause
Backpage to, "lose the considerable revenue generated by the adult
services ads," but stated that "no amount of money can justify the
scourge of illegal prostitution, and the misery of the women and
children who will continue to be victimized in the marketplace

1  provided by Backpage."

2      b.  Four days later, on September 25, 2010, Ferrer wrote an
3  email explaining that Backpage was unwilling to delete ads that
4  included terms indicative of prostitution because doing so would
5  "piss[] off a lot of users who will migrate elsewhere" and force
6  Backpage to refund those customers' fees.

7      c.  In January 2017, the U.S. Senate Subcommittee on Permanent
8  Investigations ("Subcommittee") conducted a lengthy investigation
9  into sex trafficking and Backpage, resulting in a 50-page report
10 entitled "Backpage.com's Knowing Facilitation of Online Sex
11 Trafficking."  The report concluded, among other things, that
12 virtually all of Backpage's "adult" ads were actually solicitations
13 for illegal prostitution services and that "Backpage [] maintained a
14 practice of altering ads before publication by deleting words,
15 phrases, and images indicative of criminality, including child sex
16 trafficking . . . .  Those practices served to sanitize the content
17 of innumerable advertisements for illegal transactions-even as
18 Backpage represented to the public and the courts that it merely
19 hosted content others had created."  In response to the
20 Subcommittee's report, Backpage purported to shut down the "adult"
21 section of its website.  However, a review of several thousand
22 Backpage ads demonstrated that the prostitution ads simply migrated
23 to other sections of the website, where they remained accessible
24 until the site was forced to shut down.

25      d.  On August 5, 2011, Backpage received a letter from the
26 mayor of Seattle.  This letter warned, "Seattle Police have
27 identified an alarming number of juvenile prostitutes advertised on
28 Backpage.com since January 2010," and explained that Backpage was

dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution."  The letter recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads.  Backpage never instituted an in-person age verification requirement.

36.  Backpage instituted and maintained policies and procedures designed to cultivate and sustain its promotion of sex trafficking and prostitution, but which "sanitized" some of the language Backpage customers used to advertise in order to make the advertising of sex trafficking less overt.  Backpage referred to this practice as "moderation."  For example:

a.  In April 2008, Ferrer wrote an email explaining that, although he (Ferrer) was "under pressure to clean up Phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]" and result in "lost pageviews and revenue."  Ferrer instructed Backpage's technical staff to edit the wording of such ads by removing particular terms that were indicative of prostitution, but allow the remainder of the ad to be featured on Backpage's website.

b.  On October 8, 2010, a Backpage manager sent an email threatening to fire any Backpage employee who acknowledged, in writing, that a customer was advertising prostitution:  "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion.  If you don't agree with what I'm saying completely, you need to find another job."

c.    On October 16, 2010, the same Backpage manager sent an email to a large group of Backpage employees that contained two attachments providing guidance on how to "moderate" ads.  The first was a PowerPoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts.  Next to each picture was an instruction as to whether it should be approved or disapproved by a Backpage moderator.  These instructions included "Approve.  Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve.  Rear shot okay. Transparent wet panties okay."  The second attachment was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication. The Backpage manager concluded the email by stating, "[I]t's the language in ads that's really killing us with the Attorneys General. Images are almost an afterthought to them."

d.    On October 16, 2010, the same Backpage manager sent an internal email explaining, "I'd like to still avoid Deleting ads when possible;" "we're still allowing phrases with nuance;" and "[i]n the case of lesser violations, editing should be sufficient."

e.    On October 25, 2010, Ferrer sent an email acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act."  This email also explained that, after the "sex act pics are removed," the "ad text may stay."

f.    On October 27, 2010, a different Backpage manager sent an internal email stating that Backpage was "editing 70 to 80%" of the ads it received from customers.

g.    On June 7, 2011, Ferrer received an inquiry from a law enforcement official about a particular ad that included the term

"amber alert."  In response, Ferrer acknowledged this might be "some kind of bizarre new code word for an under aged person."  Ferrer then forwarded this exchange to a Backpage manager and instructed that the term "amber alert" be added to Backpage's "strip out" list.

h.   On August 31, 2011, Backpage managers exchanged emails in which they discussed a list of 100 "solid sex for money terms." Later emails indicate that this list of terms changed but, in general, the list prohibited use of certain terms that Backpage management and employees closely identified with the obvious promotion of sex trafficking and prostitution.

i.   One Backpage manager acknowledged in the August 31, 2011 email exchange that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that were indicative of sex trafficking.  Nevertheless, Backpage published those ads after editing them to appear less obvious in promoting illegal activity.  Backpage sex trafficking ads adapted to Backpage's moderation policy by using "phrases with nuance" when promoting sex trafficking.  Following the implementation of "moderation," Backpage's list of prohibited terms changed and evolved to adjust to Backpage advertisers' use of new code words to promote prostitution. In other words, once a code word or phrase not previously associated with sex-for-money became too familiar, or was deemed to be associated with certain sex trafficking activities in the Backpage community of advertisers, Backpage's "moderation" policy would need to adapt by adding such words or phrases to the "blocked" list or risk being too obvious in its promotion.

37.  Plaintiff alleges that Backpage's policy of "moderation" only caused ads explicitly promoting sex trafficking to become more

1   coded and implicit in the ads' purpose.

2         a.   Well over half of the Backpage classified ads in various

3   Backpage categories used terms and phrases (including "massage,"

4   "dating," "escort" and others) that are consistent with sex

5   trafficking and prostitution.  These terms and phrases included,

6   "roses" (money, *e.g.*, "150 roses/half hour"), "in-call" (where the

7   customer goes to the prostitute's location), "outcall" (where the

8   prostitute goes to the customer's location), "GFE" (girlfriend

9   experience), and "PSE" (porn star experience).

10        b.   Other Backpage ads used language that was mostly free of

11  coded language, but included sexually provocative images.  The

12  sexually suggestive images included in these ads were typical of ads

13  for prostitution.  For example, one such ad posted in Backpage's Los

14  Angeles dating section depicted images of a woman on a bed with her

15  buttocks presented in a sexual manner; another included a picture of

16  a woman's cleavage; others included pictures of women posing in

17  sexual positions wearing lingerie and pictures of a woman bending

18  over, revealing her naked buttocks.

19        c.   Backpage's policy of moderation also had the effect of

20  causing and allowing otherwise neutral or innocuous terms to be

21  understood within the Backpage community as coded language for sex

22  trafficking and prostitution.  Because of the evolving use of coded

23  terms, a reader of such ads who was familiar with the particular

24  vocabulary used in Backpage "adult" ads could readily identify coded

25  terms and images indicating an ad for prostitution, while an

26  uninitiated reader may not understand these terms at all, or at least

27  not as being associated with sex-for-money.

28        38.  Almost all "adult"-type Backpage ads listed phone numbers

1  or emails that a potential customer could use to make contact with

2  the advertiser.  Comparing a sample of phone numbers and emails found

3  within Backpage ads with phone numbers and emails that were

4  frequently included in the memo sections of checks that Backpage

5  advertisers use to pay Backpage for ads, revealed the same numbers

6  and/or email addresses appeared in multiple Backpage ads as contact

7  information.  For example:

8          a.   A $25 USPS Money Order purchased on June 15, 2017, in

9  Duarte, California, made payable to "Posting Solutions PO BOX 802426,

10  Dallas, TX," and thereafter deposited into Account 1, included

11  writing on the money order listing a phone number and the words

12  "Dulce Latina."  A search of Backpage ads showed almost 800

13  advertisements listing the same phone number.

14         b.   A $20 USPS Money Order purchased in Sacramento, California,

15  and later deposited into Account 1 included writing listing a phone

16  number and the words "love my lips."  A search of Backpage ads

17  revealed almost 1300 advertisements listing the same phone number.

18         c.   A $150 Wells Fargo Bank Money Order, purchased in Arizona,

19  and made payable to "Posting Solutions," bore an email address and

20  the words, "red hot stuff."  The same email address was found to be

21  associated with advertisements on several female escort websites that

22  directed customers to contact an Arizona phone number ending in 2397.

23  A search of Backpage.com for this phone number revealed approximately

24  760 ads that included this phone number.  These Backpage ads included

25  images indicative of prostitution.  For example, one such ad posted

26  on Backpage's "massage" section included sexual images such as a

27  woman lying on a bed wearing lingerie and a woman laying naked on her

28  stomach.  One of the ads described, "Pampering provider | Body Rub

Massage | Body Shampoo | Body Scrub | 4 hands | Walk ins or appointment."  Legal massage advertisements do not typically depict sexual images.  This advertisement depicted sexual images and included terms like "4 hands," which is coded language describing a massage given to a customer by two women.  Such advertisements are indicative of prostitution.

39.  The Backpage ads that shared the same phone number or email address typically also included sexually suggestive images of different women.  Such ads are consistent with ads posted by pimps or prostitution agencies that are using the same phone number or email to advertise different women (or girls) to prospective prostitution clients.

**C.    BACKPAGE PAYMENT PROCESSING**

40.  When an advertiser (a.k.a, "poster") purchased an ad for prostitution using digital currency, the payment to Backpage (and certain subsequent expenditures) proceeded in the following manner:

a.   A poster would choose a payment method online (*e.g.*, through Bitcoin payments);

b.   If the poster did not already have Bitcoin, the Backpage website would direct the poster to a third-party exchanger to buy Bitcoin;

c.   Backpage would then provide the poster with a wallet address to send a specific amount of Bitcoin;

d.   In return for sending the required payment, the poster would receive credit that could be used to post ads on Backpage.

e.   Backpage would sell the Bitcoin to a third party exchanger, frequently "GoCoin", in batches, generally valued in hundreds of thousands of dollars in order to convert the Bitcoin into U.S. or

foreign currency, which GoCoin generally holds in foreign bank accounts;

f.    GoCoin would then wire funds from foreign accounts to either (1) Backpage controlled foreign accounts; or (2) Backpage controlled domestic operating accounts;

g.    Which accounts were held and controlled by Backpage Operators in the names of entities controlled by Backpage, including Ad Tech BV, Posting Solutions, Website Technologies, and Cereus Properties.

h.    The funds derived from these foreign transactions would be used by Backpage to pay for services, like Verizon in Los Angeles, or transferred to Backpage Operators' accounts and accounts held in their family members' names.

i.    For example, in March 2015, Ad Tech BV, a Netherlands based company, listing Ferrer as CEO and M.G. as CFO, opened a bank account in the Netherlands (the "Netherlands Account").  M.G. is the President, CEO, Treasurer and Secretary of Posting Solutions LLC, a wholly owned Backpage subsidiary with a principal place of business located in Dallas, Texas ("Posting Solutions").  From March 2015 through November 2017, the Netherlands Account received millions of dollars from Binary Trading SG PTE, Limited ("Binary Trading").  On April 4, 2017, M.G. sent an email to employees of the bank that maintains the Netherlands Account.  The email explained:

> Binary Capital is our trading partner, they hold money in
> trust for Go Coin [sic].  Rather than incurring 3 sets of
> wire fees which make our transactions unprofitable, they
> act as our agent and disburse payments directly from our
> trust account to our merchant.

**D.   ACCOUNT 1 (Prosperity '7188 Funds)**

41.   On February 15, 2017, Posting Solutions opened Account 1. M.G. is the sole signatory on the account.  Posting Solutions LLC is owned by and controlled by Backpage.

42.   The application for the P.O. Box identifies the renter of the box as "Website Technologies, LLC/Backpage.com."  Listed on the Application were the names of several Backpage Operators, including Ferrer.

43.   Between August 1 and September 1, 2017, Account 1 received more than $2,781,750 in wire transfers from foreign banks.  For example:

a.   On or about August 16, 2017, Binary Trading wired $535,500 from an account in Singapore into Account 1.

b.   On or about August 17, 2017, Binary Trading wired $528,500 from a Singapore account into Account 1.

c.   On or about August 30, 2017, a company named Trilix PTE LTD ("Trilex"), listing the same Singapore address as Binary Trading and GoCoin, sent four wire transfers from a Singapore account (GoCoin's "Singapore Account") into Account 1, ranging from $385,450 to $492,250, totaling approximately $1,717,750.

44.   Plaintiff alleges that a substantial percentage of outgoing payments from Account 1 have been payments for the operation of Backpage.com.  For example, between July and October 2017, funds were wired from Account 1, as following:

a.   $570,530 to Verizon Digital Media Services in Los Angeles for services related to the Backpage.com website; and

b.   $1,497 to "Backupify," a company that provided data backup services for Backpage.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CEREUS PROPERTIES ASSETS**

**E.    ACCOUNT 2 (Compass '3873 Funds)**

45.    Account 2 was held in the name of Cereus Properties LLC, and Spear was the sole signatory.  This account was funded in part with transfers from Account 1, which funds are alleged to have been traceable to SUA, involved in money laundering, or both, and was used as a funnel account to pay Backpage Operators.  On average, during each month of 2017, several hundred thousand dollars were transferred from Account 1 to Account 2.  For example:

a.    On August 31, 2017, Account 1 sent a wire transfer totaling $487,491.45 to Account 2.

b.    On September 15, 2017, Account 1 sent a wire transfer totaling $91,672.67 to Account 2.

c.    On October 2, 2017, Account 1 sent a wire transfer totaling $471,766 to Account 2.

46.    Funds from Account 2 were also used to promote and facilitate prostitution.  For example:

a.    On December 2, 2016, the Netherlands Account transferred $324,055.85 to Account 2;

b.    On December 8, 2016, the Netherlands Account transferred $499,970.00 to Account 2;

c.    On December 27, 2016, the Netherlands Account transferred $199,970.00 to Account 2; and

d.    From March to December 2017, Account 2 paid over $9,000 to "Cox Communications," an internet services company that Backpage used to facilitate its internet presence and promote its sale of prostitution advertising.

**F.   ACCOUNT 3 (Compass '4862 Funds)**

47.   Account 3, held in the name of Cereus Properties, was funded with funds from foreign and domestic bank, which funds were traceable to SUA, involved in  money laundering, or both, including funds transferred from the Netherlands Account, through a pass-through account, Wells Fargo Bank account '9863 ("Account '9863"), and eventually funneled into Account 3.

## TRACING FOR SCOTT SPEAR ASSETS

**G.   ACCOUNTS 31, 32, AND 33 (NBA '0178, '0151, AND '3645 FUNDS)**

1.   Accounts 31 and 32 ('3645) are held in the name of Spear. Account 33 is held in trust for the benefit of Spear and certain of his family members.  In furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money, Backpage Operators used these accounts as go-betweens[4] to funnel money from one account to another.

a.   Between December 14, 2015, and January 15, 2016, a GoCoin account in Slovakia, which Backpage used to accept crypto-currency payments for ads, sent approximately 26 wire transfers totaling over $2.5 million to the Plano, Texas based Branch Banking & Trust account number '2008 belonging to Website Technologies.[5]

b.   On January 15, 2016, Branch Banking & Trust account number '2008 transferred $189,571 to Verizon in Los Angeles, California, in

---

[4] A "go-between" (*a.k.a.*, a "pass-through") is an account set up for the main purpose of transferring funds from one or more bank accounts to various other bank accounts.

[5] Branch Banking and Trust Bank account '2008 is a U.S. based account that Backpage used to receive funds from overseas accounts that were set up to accept crypto-currency payments for Backpage ads. For the period of December 14, 2015, through August 30, 2016, in approximately 154 wires, GoCoin's Slovakia and Singapore accounts transferred a total of approximately $26,100,235.83 to Branch Banking & Trust account number '2008.

1  payment for Backpage internet services.

2      c.   Between January 21, 2016, and August 31, 2016, Branch

3  Banking & Trust account number '2008 sent approximately 27 wire

4  transfers totaling approximately $48 million to Arizona Bank & Trust

5  account number '6211.

6      d.   Between March 1, 2016, and July 1, 2016, Arizona Bank &

7  Trust account number '6211 wire transferred $892,426 into Account 31.

8      e.   On September 14, 2017, Account 2 wire transferred

9  $50,162.05 into Account 31.

10      f.   On October 12, 2017, Account 31 transferred approximately

11  $21,500 into Account 32.

12      g.   On January 5, 2018, Account 31 transferred approximately

13  $600,000 into Account 33.

14      **H.   ACCOUNT 34 (LIVE OAK BANK ACCOUNT '6910 FUNDS)**

15      2.   Account 34 is held in the name of Spear.

16      3.   On or about March 16, 2016, as an opening deposit, Account

17  31 transferred $250,000 into Account 34.

18      **I.   ACCOUNT 35 AND 36 (ASCENSUS BROKER SERVICES '4301 and '8001**

19          **FUNDS)**

20      4.   Accounts 35 and 36 are held in the name of N. Spear,

21  Spear's adult daughter.

22      a.   On February 23, 2017, Account 31 transferred approximately

23  $50,000 into Account 35.

24      b.   On the February 23, 2017, Account 31 transferred $50,000

25  into Account 36.

26  / / /

27  / / /

28

38

WHEREFORE, the United States prays:

a.    that due process issue to enforce the forfeiture of the Defendant Asset;

b.    that due notice be given to all interested parties to appear and show cause why forfeiture should be not be decreed;

c.    that this Court decree forfeiture of the Defendant Asset to the United States of America for disposition according to law; and

d.    for such other and further relief as this court may deem just and proper, together with the costs and disbursements of this action.

Dated: September 28, 2018        NICOLA T. HANNA
                                 United States Attorney
                                 LAWRENCE S. MIDDLETON
                                 Assistant United States Attorney
                                 Chief, Criminal Division
                                 STEVEN R. WELK
                                 Assistant United States Attorney
                                 Chief, Asset Forfeiture Section


                                 _____/s/*John J. Kucera*_____
                                 JOHN J. KUCERA
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 United States of America

## **VERIFICATION**

I, Lyndon A Versoza, hereby declare that:

1.    I am a United States Postal Inspector with the United States Postal Inspection Service.  I am the case agent for the civil forfeiture action entitled *United States v. $404,374.12 in Bank Funds Seized from National Bank of Arizona Account '0178, et al.*

2.    I have read the above Verified Complaint for Forfeiture and know its contents, which is based upon my own personal knowledge and reports provided to me by other agents.

3.    Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2018 in Los Angeles, California.

_____
LYNDON A VERSOZA
U.S. Postal Inspector
United States Postal Inspection
Service

41